**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| T.G., A MINOR CHILD; BY AND THROUGH HIS GUARDIAN AD LITEM TERESA GROSS,<br>Plaintiff,<br>v.<br>MARIPOSA COUNTY UNIFIED SCHOOL DISTRICT,<br>Defendants. | Case No. 1:19-cv-01201-NONE-EPG<br>FINDINGS AND RECOMMENDATIONS THAT PETITION FOR MINOR'S COMPROMISE BE APPROVED<br>(ECF Nos. 13, 15)<br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

On August 30, 2019, Plaintiff T.G., a minor child, by and through his guardian ad litem Teresa Gross ("Plaintiff"), commenced this case by filing an action against Mariposa County Unified School District (the "District"). (ECF No. 1). On April 6, 2020, Plaintiff filed a petition for approval of minor's compromise. (ECF No. 13). That petition was supplemented with a joint statement on May 6, 2020. (ECF No. 15). On May 13, 2020, the Court heard oral argument on the parties' petition for approval of compromise of a minor's claim under Title VI of the Civil Rights Act of 1964. (ECF No. 16). Daniel Shaw (Shaw Firm) appeared on behalf of Plaintiff T.G., a minor. Teresa Gross, T.G.'s mother and guardian ad litem, also attended. Kristi Marshall (Whitney, Thompson & Jeffcoach, LLP) appeared on behalf of Defendant Mariposa County Unified School District (the "District"). For the reasons described below, the Court RECOMMENDS that the petition be APPROVED.

\\\

## I. BACKGROUND

### A. Plaintiff's complaint

Plaintiff's complaint alleged the following:

During the 2017-2018 school year, T.G., a mixed-race child with African American heritage, was a five-year-old child who attended an elementary school in the District. T.G. also had significant speech and language deficits. As alleged by Plaintiff, T.G. was a happy, outgoing and friendly child before the incidents bringing about this case. But T.G. became the target of race-based bullying. He was called "poop," "bitch," and "asshole" by his bullies, who also made fun of his hair. When T.G.'s parents reported the incidents to his teacher, the teacher failed to follow the District's policy and report the incident to her superiors. Over the course of the year, T.G.'s behavior changed. He no longer wanted to play or attend school, and he called himself names. Then T.G. was slapped by a bully at school; the slap left a mark. When T.G.'s parents spoke to the teacher again, she again did not report the bullying to her superiors.

The bullying escalated. T.G.'s bully called him a "nigger" at school and continued to hit him, call him "bitch," shove him, and otherwise physically assault him, and the bully also encouraged others to do the same. Along with the physical harms, T.G. also suffered psychological harms, including nightmares and reduced appetite.

Ms. Gross met with T.G.'s principal to report the incidents. The principal responded, "well you did move your family to a rural area," and told Ms. Gross that racism was more acceptable in Mariposa County because there are fewer African Americans there.[1] The racial bullying continued, leading T.G.'s parents to pull him out of school.

### B. The District's Defenses

The District argues that it was not put on full notice of the alleged problem, that the school took reasonable steps to work with the student and parents based on the facts it knew at the time, that the damages were not caused by the complained-of behavior, and that res judicata applies to Plaintiff's claims.

---

[1] At oral argument, the District did not concede that the principal made those comments. The District noted that the principal denied having said so and that two reviews of the situation did not conclude whether she made those comments. At oral argument, the District represented to the Court that the principal understands being in a rural area with few African Americans does not excuse such conduct.

**C. Update Regarding T.G. Since Filing Complaint**

According to the Joint Summary in Support of Plaintiff's Petition for Approval of Minor's Compromise, (ECF No. 15), and as further discussed at oral argument, T.G. has since improved. Now age seven, he remains a student in the school district, but at a different school with a different principal.[2] He received psychotherapy for about one year, at a cost of $6,051.82, for which there is an outstanding $4,538.87 lien. Before reaching the tentative settlement, the District added a training program aimed at racial issues with bullying.

**D. Terms of the Proposed Settlement**

As a result of the proposed settlement, Defendant will pay $90,500. Of that, approximately $6,000 will be spent to create a special needs trust under 42 U.S.C. § 1396p(d)(4)(A) and California Probate Code § 3600 *et seq.* Plaintiff's counsel represented that the trust will be monitored by a state court. The attorney setting up the trust is experienced in these matters and will ensure that it is set up in a way that will best benefit T.G., particularly in light of the nature of T.G.'s injuries.

Another $4,538.87 will be spent to pay off the medical lien. This will leave approximately $80,000 in trust for T.G.

In addition, T.G.'s attorney in this case will receive $17,000. His attorney for the special education dispute will receive $12,500. These amounts are in addition to the amounts described above, and will not be deducted from T.G.'s portion of the settlement.

The proposed settlement fully resolves all claims that were raised or could have been raised up to February 10, 2020 between T.G. and the District. It also resolves the parties' separate, special education dispute with the Office of Administrative Hearings. That dispute lead to T.G.'s current individualized education plan to deal with several of his learning disabilities.

**II. DISCUSSION**

**A. Legal Standards**

District courts have a special duty to safeguard the interests of litigants who are minors. *Robidoux v. Rosengren*, 638 F.3d 1177, 1181 (9th Cir. 2011). This special duty is derived from

[2] The teacher who allegedly failed to report the bullying no longer teaches at the District.

Federal Rule of Civil Procedure 17(c), which provides that "a district court 'must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.'" *Id*. (quoting FED. R. CIV. P. 17(c)). "In the context of proposed settlements in suits involving minor plaintiffs, this special duty requires a district court to 'conduct its own inquiry to determine whether the settlement serves the best interests of the minor.'" *Id*. (quoting *Dacanay v. Mendoza*, 573 F.2d 1075, 1080 (9th Cir.1978)).

As part of the inquiry, the district court is required to evaluate "whether the net amount distributed to each minor plaintiff in the settlement is fair and reasonable, in light of the facts of the case, the minor's specific claim, and recovery in similar cases." *Id*. at 1182. "So long as the net recovery to each minor plaintiff is fair and reasonable in light of their claims and average recovery in similar cases, the district court should approve the settlement as proposed by the parties." *Id*. The duty to safeguard the interests of minors in settlement has been codified in this Court's Local Rule 202. *See* CAED-LR 202. In relevant part, Local Rule 202(e) provides:

> Whenever money . . . is recovered on behalf of a minor . . . the money . . . will be (1) disbursed to the representative pursuant to state law upon a showing that the representative is duly qualified under state law, (2) disbursed otherwise pursuant to state law, or (3) disbursed pursuant to such other order as the Court deems proper for the protection of the minor . . .

**B. Application**

To determine whether the settlement is fair and reasonable, the Court will first turn to the amount distributed to the minor. The Court makes this determination "in light of the facts of the case, the minor's specific claim, and recovery in similar cases." *Robidoux*, 638 F.3d at 1182. The Court determines that the settlement amount is fair and reasonable under *Robidoux* for three reasons.

First, the settlement is particularly large compared to Plaintiff's bill for one year of psychotherapy, which was, after negotiation, $4,538.87.

Second, other cases with some factual similarities resulted in far smaller payments from the school districts. *See Robidoux*, 638 F.3d at 1182 (noting "recovery in similar cases" is a relevant factor in determining whether a proposed settlement is fair and reasonable to the minor).

\\\

Plaintiff points the Court to two cases in his petition, each of which was decided before *Robidoux* but had substantially smaller payments from the school districts. (ECF No. 13, at 5-6). *Pankey v. Visalia Unified School District*, No. 1:06-cv-355-SMS (E.D. Cal. March 29, 2006), concerned two seventeen-year-olds who alleged racial discrimination by their school. The size of the settlement there was significantly smaller: after fees, each minor received $13,524.65. *Pankey*, ECF No. 21. But the case was settled before *Robidoux*, and the Court did not seem to undertake a fairness and reasonableness analysis. *Id.*, ECF No. 27.

In *Randolph v. Grossmont Union High School District*, No. 08-cv-1371 (S.D. Cal. July 29, 2008), plaintiff Randolph, an African American high school student, alleged he was attacked at school by a racist member of a gang and sued both the district and the attacker, Zahorik. He further alleged that the district knew Zahorik was the member of a racist gang and was slow to respond to Randolph after Zahorik attacked him. *Randolph*, Complaint, ECF No. 1. The court there determined the $57,500 ($40,010 of which went to the plaintiff) settlement reflected Grossmont's "fair and proportionate share of its proportionate liability when taking into account the rough approximation of [Randolph's] total recovery." *Id.* ECF No. 70.

The Court located one other case: *T.V. v. Sacramento City Unified School District*, 2:15-cv-889, 2018 WL 3869171 (E.D. Cal. Aug. 15, 2018). There, six minor Hispanic students were denied entrance into a program at their elementary school and were subjected to race-based peer harassment. The Court approved the settlement, where the minors split a $43,925 settlement after attorneys' fees, and their settlements ranged from $683 to $14,584.50.

The proposed settlement here provides for a substantially larger settlement than the others cited above.

Comparison with these cases is somewhat misleading, however, because the proposed settlement covers more than just the allegations in the complaint. As described above, it also includes settlement of parties' separate, special education dispute with the Office of Administrative Hearings. The Court does not have a detailed understanding of those proceedings or the recoveries that could have been at stake in them.

\\\

Nevertheless, with the information available to this Court, the comparison of the settlement amount with these other settlements appears to support that this settlement amount is fair and reasonable.

The third reason convincing the Court that the settlement is fair and reasonable is the nature of the negotiations. This was an arm's length transaction and involved a private mediation. Plaintiff was represented by his guardian ad litem and counsel. Plaintiff's counsel represented to the Court that an experienced attorney will set up the trust in such a way to maximize its benefit for Plaintiff.

In light of all these factors, and in consideration of the legal standards described above, the Court recommends approving the proposed settlement.

**C. Order Regarding Use of Funds**

Given the fact that the settlement amount reflects a compromise of both the educational disputes and the underlying litigation, the Court wishes to confirm its understanding regarding the appropriateness of the use of at least some of these funds as a remedy for the racial bullying described in the complaint.

This issue was discussed extensively on the record. The Court expressed its concern that the described use of the funds appeared to only encompass educational issues, which while worthy, did not directly address the remedy for the allegations in this case. All parties and counsel confirmed on the record that they understood the settlement funds could be used for targeted programs that would seek to remedy the damage done from the underlying incidents, including racial bullying and the resulting low racial self-esteem. However, it did not appear that any party or counsel had fully researched the issue and proposed any specific use directed to this purpose.

Thus, while the Court does not seek to modify the terms of the settlement, which provide for a procedure for approval of use of the funds, it is the Court's understanding in recommending approval of this settlement that funds will be used in part for the purpose of remedying the effects of racial bullying. Based on the Court's very limited research, it appears that the work done in the area of racial socialization may be instructive in consideration of such use:

> Racial socialization is the process by which society transmits messages to youth about the significance and meaning of their race and ethnicity and associated values and norms (Hughes, Hagelskamp, Way, & Foust, 2009; Hughes et al., 2006; Neblett et al., 2009). Racial socialization is a strategy for raising healthy children in a society where being Black often has negative connotations (Hughes et al., 2009; Smalls, 2010; White-Johnson, Ford, & Sellers, 2010). Primary racial socialization themes include cultural pride, preparation for bias, egalitarianism, self-worth, and responding appropriately to negative messages (Bowman & Howard, 1985; Hughes et al., 2006). Cultural pride messages are those that emphasize the history and accomplishments of African Americans, whereas preparation for bias messages prepare youth for racial discrimination experiences and provide strategies for coping with them. Egalitarian messages stress interracial equality, while self-worth messages emphasize positive views of oneself. Finally, negative messages focus on stereotypical views of African Americans. A growing body of research on racial socialization dimensions and practices shows that the racial socialization of African American children is an important part of preventing the negative effects of living in a society where racist experiences and discrimination may occur (Johnson, 2001; McMahon & Watts, 2002). Racial socialization plays an important role in promoting positive identity development for African American youth (Seaton, Yip, Morgan-Lopez, & Sellers, 2012).
>
> Although researchers have identified several racial socialization themes, empirical studies demonstrate that socialization messages related to cultural pride and preparation for bias relate most consistently to youth outcomes (see Hughes et al., 2006, for a review). …

Naidi Okeke-Adeyanju, Lorraine C. Taylor, et al., Celebrating the Strengths of Black Youth: Increasing Self-esteem and Implications for Prevention (NIH Public Access author manuscript), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4152398/. Such use may involve travel[3] to the extent it involves exposure to other people and places that facilitate a positive racial self-esteem.

## III. CONCLUSION AND RECOMMENDATION

The Court has reviewed the complaint, the petition for approval of minor's compromise, the parties' joint statement in support of the petition, and has conducted a hearing. (ECF Nos. 1, 13, 15, 16). The record indicates that the proposed settlement is fair and reasonable to the minor.

Accordingly, the Court HEREBY RECOMMENDS that Plaintiff's Petition for Approval of Minor's Compromise, (ECF No. 13), be GRANTED

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B). Within fourteen (14) days of service of these findings and recommendations, any party may file written objections with the Court and serve a

[3] One non-exclusive example of such an activity is a visit to the National Museum of African American History and Culture in Washington D.C.

copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Wilkerson v. Wheeler*, 772 F. 3d 834, 839 (9th Cir. 2014); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **May 22, 2020**

/s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE